

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2002 NOV 26  PM 4: 26

LORETTA G. WHYTE
CLERK

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| Alcan Rubber & Chemical, Inc.<br>and Royal & Sunalliance Insurance<br>Australia Limited<br>          **Plaintiff** | **CIVIL ACTION**<br><br>**NO.  00-0033 and 00-3467<br>consolidated NO. 00-0033** |
| **VERSUS** | **SECTION: "S" (2)<br>Judge Lemmon** |
| M/V STAR GRAN, her engines, tackle,<br>apparel, etc., *in rem*, STAR SHIPPING<br>A.S., P.T. Andhika Lines and Gran, Inc., *in<br>personam*<br><br>          **Defendants** | **MAGISTRATE:<br>Mag. Wilkinson** |

## OPPOSITION TO MOTION IN LIMINE TO EXCLUDE THE TESTIMONY OF PLAINTIFFS FIRE EXPERT GEORGE F. CASELLAS

MAY IT PLEASE THE COURT:

Plaintiffs, Alcan Rubber & Chemical, Inc. and Royal & Sunalliance Insurance Company, Australia Ltd. (collectively "plaintiffs") oppose defendants, Star Shipping A.S. Grieg Shipping A.S. and Gran, Inc.'s ("Star interests") Motion to Exclude the Testimony of Plaintiff's Fire Expert George F. Casellas of Marine Consulting Services, Inc. on the basis that:

- Plaintiffs were working on the erroneous assumption that this matter had been stayed pending the Fifth Circuit Court of Appeal's decision in *Alcan v. P.T. Andhika Lines*;

- Permitting Casellas to testify in the case will not prejudice defendants; as the Star interests expert, John Atherton, based his report on an inspection of the vessel during discharge of plaintiff's cargo; plaintiffs will make Casellas available immediately for deposition and permit defendants to supplement their expert report to respond to Casellas' deposition testimony and report.

- Allowing the Star interests to take the deposition of Mr. Casellas and amend their expert reports will cure any alleged prejudice;

- Mr. Casellas' testimony concerns the cause and origin of the fire which occurred on board the M/V STAR GRAN, a significant issue in this case.

For all these reasons, as more fully explained below, this court should deny the Star interests Motion in Limine.

## **BACKGROUND FACTS**

This matter involves damage to consignments of rubber and plasterboard carried on board the M/V STAR GRAN from Indonesia to New Orleans, Louisiana and Pensacola, Florida. During the voyage, a fire erupted on board the M/V STAR GRAN, causing her to seek refuge in the port of Reunion Island. Upon arrival in New Orleans, it was discovered that plaintiffs cargo had been damaged, in part, by the fire upon the M/V STAR GRAN.

Suit was instituted in the United States District Court for the Eastern District of Louisiana on behalf of Alcan on January 5, 2000. Suit was filed by Royal & Alliance on November 22, 2000 (C.A. No. 00-3467) and subsequently consolidated with C.A. No. 00-33. In the Alcan suit, in

addition to the Star interests, P.T. Andhika Lines ("Andhika") was named as a defendant by Alcan

in that suit. [Docket Entry No. 1]. Andhika, like the Star interests, was a carrier of the Alcan rubber

cargo. On November 13, 2001, Andhika filed a Motion for Summary Judgment before the court.

[Docket Entry No.23]. On May 20, 2002, the district court granted Andhika's Motion, dismissing

Alcan's claims against P.T. Andhika. [Docket Entry No. 37]. Alcan had moved the court to certify

its judgment pursuant to Rule 54(b) and thereafter filed a Notice of Appeal to the United States Court

of Appeals for the Fifth Circuit. [Docket Entries Nos. 38, 40]. Alcan has submitted its appellant's

brief to the Court of Appeals.

In light of the appeal, counsel for Alcan was operating under the erroneous belief that the

instant matter had been stayed pending the outcome of the appeal.[1] Counsel for plaintiffs confused

the nature of the appeal in the instant action with another case pending in this section where a single

party appealed to the Fifth Circuit pursuant to 28 U.S.C. §1292 (b), and the action was stayed

pending the outcome of the appeal. *See,* footnote 1. Thus, plaintiffs' counsel mistakenly believed

that the deadline for exchange for expert reports had been suspended pending the Court of Appeal's

decision regarding the dismissal of Andhika.

Defendants fire expert, Dr. John Atherton of Burgoyne Incorporated, was retained

immediately after the fire onboard the vessel and attended an inspection of the vessel in December

1999 in New Orleans (during the discharge of plaintiffs cargo, in order to determine the "cause of

---

[1]      In another case before this section in which counsel is involved, *Nuevo Pignone v. M/V STORMAN ASIA et al*, C.A. 00-534 ("S") (1), defendant Fagioli S.p.A. certified this sections denial of a Motion to Dismiss pursuant to 28 U.S.C. §1292 (b). As part of the court's interlocutory certification, the entire action against all defendants was stayed pending the outcome of the appeal.

the fire". (Exhibit "A", p.1-2). Although Dr. Atherton has been involved with this case since the date of the fire and his report is based upon his personal inspection of the M/V STAR GRAN during the discharge of the damaged cargo, plaintiffs are willing to make Mr. Casellas available for an immediate deposition and allow defendants the opportunity to have Dr. Atherton provide a supplemental report to respond to the report and testimony of Mr. Casellas.

## LAW AND ARGUMENT

The Fifth Circuit has directed district courts to consider four factors in determining whether to exclude testimony of a witness. These factors are: (1) The explanation, if any, for the party's failure to comply with the discovery order; (2) The prejudice to the opposing party of allowing the witness to testify; (3) The possibility of curing such prejudice by granting a continuance; and (4) The importance of the witness' testimony. *Campbell v. Keystone Arial Surveys, Inc.*, 138 F.3d. 996, 1000 (5th Cir. 1998). Counsel in the instant case was operating under the erroneous belief that the instant matter had been stayed pending a decision from the Fifth Circuit regarding the dismissal of Andhika.[2] *See*, footnote 1. The mistake of counsel is excusable neglect, for which it should be given an opportunity to present its expert. F.R.C.P. 60(b).

The Star interest fire expert, Dr. John Atherton, was in attendance at the discharge of the M/V STAR GRAN and investigated cause of the fire onboard the M/V STAR GRAN immediately after the vessel's arrival in the Port of New Orleans. *See*, Exhibit "A". Given Dr. Atherton's early involvement in the case, defendants in this matter will not be prejudiced if Mr. Casellas is permitted

---

[2]    Counsel understands that the court may exclude testimony witnesses "to preserve the integrity and purpose" of the scheduling order. *See, Vienne v. American Honda Motor Company*, 2001 WL 43598 (E.D. La. 2001) (Clement, J.) As discussed *infra,* however, plaintiffs show that there will be no prejudice to the Star interests if Casellas is permitted to testify in this matter.

to testify in this case. In fact, plaintiffs Motion in Limine does not even allege any form of prejudice. Rather, it simply states that the report of Mr. Casellas was not timely submitted. Further, as counsel for plaintiffs will make Casellas immediately available for a deposition and will give the Star interest the opportunity to allow Dr. Atherton to supplement his expert report. Such action would cure any potential prejudice to defendants.

Finally, plaintiffs will be placed in a position where they will not be able to present an expert regarding cause and origin of the fire if Mr. Casellas is not permitted to testify. It is equitable that both plaintiffs and Star interest present such expert testimony to the court so that a fair and proper decision may be rendered. *See, T.T. Boat Corporation*, 1999 WL 643664, *6 (E.D. La. 1999) (Duval, J.) (Refusing to strike untimely expert report, reasoning that each party would have the opportunity to present expert testimony on issue as to whether mate could hear the foghorn; each party will have the opportunity to cross examine the expert; and if the court were to strike the report and/or testimony, only one party would be able to put on expert testimony on the issue).

## CONCLUSION

For all these reasons, plaintiffs show that the Star interests Motion in Limine should be denied and Mr. George Casellas should be permitted to testify in the instant matter.

DEUTSCH, KERRIGAN & STILES, L.L.P.

JOHN F. FAY, JR. (La. Bar #1870), T.A.
WILLIAM K. TERRILL, II (La.Bar #25897)
755 Magazine Street
New Orleans, Louisiana 70130
Tel: (504) 581-5141
Fax: (504) 566-1201
**Attorneys for Alcan Rubber & Chemical, Inc. and Royal & Sunalliance Insurance Australia Limited.**

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the above and foregoing pleading has been forwarded

to all counsel of record via first class mail delivery, and telefax addressed to them on this 26th day

of November, 2002.

_____
WILLIAM K. TERRILL, II

G:\VICTORIA\Jff\Star Gran\PLEADING\Opposition.wpd

# BURGOYNE INCORPORATED
## CONSULTING SCIENTISTS AND ENGINEERS

2864 JOHNSON FERRY ROAD, SUITE 100, MARIETTA, GEORGIA 30062-5635
ASSOCIATED OFFICES IN ENGLAND, SCOTLAND AND SINGAPORE

OUR REF:

TEL: 770-552-0064
FAX: 770-552-1165

### REPORT ON THE FIRE
### THAT OCCURRED ON BOARD
### THE "STAR GRAN"
### ON THE 22ND NOVEMBER 1999

BY

DR. JOHN G. ATHERTON

FILE:  A/1468/JGA

DATE:  7TH OCTOBER 2002

EXHIBIT

A

# TABLE OF CONTENTS

1.    INTRODUCTION

2.    THE VESSEL

3.    THE SEQUENCE OF EVENTS

4.    THE SEAT OF THE FIRE

5.    IGNITION MECHANISMS

      5.1    Human Agency

      5.2    Cargo Lights

      5.3    Frictional Heating

      5.4    Hot Work

      5.5    Self Heating of Rubber Cargo

6.    FIRE FIGHTING

7.    CONCLUSIONS

APPENDIX

**REPORT ON THE FIRE**
**THAT OCCURRED ON BOARD**
**THE "STAR GRAN"**
**ON THE 22ND NOVEMBER 1999**


**BY**

**DR. JOHN G. ATHERTON**

**FILE: A/1468/JGA**                          **DATE: 7TH OCTOBER 2002**


**1.      INTRODUCTION**


At around 1345 hours local time on the 22nd November 1999, a fire was discovered in the number 8 cargo hold of the motor vessel STAR GRAN. At the time of the fire, the vessel was loaded with cargo and on passage to Houston. The crew of the vessel injected carbon dioxide into the affected space and extinguished the fire. My partner, Dr. C.D. Foster, based in our London office, provided initial advice on monitoring the situation and the precautions to be taken to mitigate the risk from the fire. The vessel diverted to Reunion in the Indian Ocean, for inspection of the fire affected hold and re-stowing of the cargo.

The vessel subsequently arrived in the United States and discharged part of the cargo in Houston and then moved to New Orleans, where further discharge of cargo was carried out. The vessel then visited Pensacola to complete cargo operations.

On the 23rd of December 1999, I received instructions from Terriberry, Carroll and Yancey, Attorneys acting on behalf of Star Shipping, the Charterers of the vessel, to attend in New Orleans, carry out an inspection of the vessel and provide assistance in determining the cause of the fire

I attended in New Orleans between the 1st and 4th of January 2000, at which time cargo discharge was observed and an inspection of the vessel was carried out.

In addition to inspecting the vessel, I have been provided with numerous photographs, documents relating to the voyage, and depositions. A complete list of documents presently held in my file is contained in Appendix 1.

2

## 2.    THE VESSEL

The steel built motor vessel STAR GRAN is a multipurpose vessel, with 10 cargo holds located forward of the engine room, accommodation, and navigation bridge.

Access tunnels are located on the port and starboard side of the vessel, outboard of the cargo spaces and extending the entire length of the vessel.

The cargo holds are fitted with a combined smoke detection and carbon dioxide ($CO_2$) full flood fire extinguishing system.

## 3.    THE SEQUENCE OF EVENTS

The STAR GRAN loaded a cargo of plasterboard and palletized rubber in number 8 hold, in Cigading. This cargo was for discharge at various ports in the United States of America. It is understood that loading of the plasterboard cargo in number 8 hold commenced at around 0112 hours on the 1st of November and was completed at around 0224 hours on the 4th of November. After completing the loading of the plasterboard cargo, plywood sheeting was laid over the plasterboard in order to create a floor onto which the palletized rubber cargo could be loaded. The loading of the rubber cargo on top of the plasterboard commenced at around 1320 hours on the 15th of November. This loading was completed by 1455 hours on the 16th of November 1999.

The stow was secured and void spaces were filled using rubber air bags. The stowage plan for the vessel is given in Figure 1 in Appendix 2 and the stowage plan for number 8 hold is shown in Figure 2 in Appendix 2.

The vessel subsequently sailed from Cigading at 2054 hours on the 16th of November 1999.

On the 21st of November, the vessel encountered heavy weather which caused the vessel to pitch and roll moderately at times. The heavy weather continued and on the morning of the 22nd of November, it is understood that a thumping or banging noise was heard coming from one of the holds. The Chief Officer reported that the sound was

loudest in number 7 hold. It is understood that the crew checked holds 3, 5, 7, 9 and 10 and shored up, chocked, and tightened the lashings of cargo as required. They could not inspect the cargo in hold number 8 due to the access hatches being blocked by cargo and the cargo being stowed up to within 20 to 40 centimeters of the hatch cover.

After lunch on the 22nd of November, the maintenance crew resumed work on the main deck of the vessel. At around 1345 hours, smoke was observed coming from around the number 8 hatch cover. Shortly thereafter, the smoke detector sounded and indicated the presence of smoke in number 7 and number 8 cargo holds.

The crew of the vessel laid out fire hoses and started the fire pump. Boundary cooling on and around number 8 hold was then commenced.

The Master contacted the Owners to inform them of the situation and indicated that he was about to release carbon dioxide into the hold. By 1418 hours, all crew had been accounted for and the Master gave permission to release three cylinders of $CO_2$ into number 8 hold. It is understood that the first cylinders were fired at around 1425 hours. Boundary cooling on and around the hold was continued and at 1428 hours, a fourth cylinder of $CO_2$ was released into number 8 hold. Fifth and sixth cylinders of $CO_2$ were released at 1433 and 1436 hours respectively and at around 1440 hours, the seventh, eighth, and ninth cylinders were released. At 1448 hours, a further 3 cylinders were released into the hold and the thirteenth bottle was released at around 1500 hours.

5

The crew conducted checks of the hold by taking temperatures of the forward and aft bulkheads and sides of number 8 hold by the under deck passages. No sign of increased temperature was noted. At around 1530 hours, the Chief Officer and Chief Engineer checked the starboard and port sides of number 8 hold respectively via the under deck passages and noted normal temperatures. It was therefore concluded that the fire had been extinguished.

At 1606 hours, the fourteenth cylinder of $CO_2$ was released into number 8 hold. Additional $CO_2$ was released periodically as the vessel proceeded to Reunion and a total of 24 cylinders of $CO_2$ were finally expended.

The vessel resumed full speed and proceeded to the island of Reunion. The STAR GRAN arrived at Reunion on the 26th of November 1999 and berthed at around 1700 hours.

The number 8 hatch was opened in Reunion and it was found that the fire had been extinguished by the injection of $CO_2$. It was also noted that some 20 units of rubber had been affected in the top tier with burning to the shrink wrap in varying degrees. It was also noted that a number of individual rubber blocks on pallets in the forward part of the hold had melted and resolidified to a solid mass which was adhering to the forward metal plating of the hold. It was concluded from the observed fire damage to the cargo that the fire had originated in the plywood, beneath the pallets of rubber and on top of the plasterboard, at the forward end of the stow and to port of the centerline.

In addition to the fire damage, it was noted that the stow was covered with a layer of gypsum dust.

Discharge of the damaged pallets of rubber in the forward part of number 8 hatch commenced on the 27th of November 1999.  Pallets of cargo that were considered salvageable were placed on the number 9 hatch cover for later re-stowing.  Badly fire damaged cargo was placed in 2 containers.   Photographs were taken during the discharge of the cargo.

After re-stowing the cargo and securing as necessary, the vessel proceeded to the United States of America for cargo discharge.

## 4.    THE SEAT OF THE FIRE

From an examination of the photographs taken in Reunion, the description of the damage observed at that port and from an inspection of the vessel in New Orleans, it would appear that this fire originated in the upper part of the cargo in the forward part of number 8 hold and to port of the centerline. The fire had involved the baled rubber cargo positioned on top of the plasterboard in this forward port area of the hold and the plywood sheets that were laid over the plasterboard.

The fuel for the fire included the baled rubber, the shrink wrap material, the pallets on which the rubber was loaded, and the plywood positioned over the plasterboard.

8

5.    **IGNITION MECHANISMS**

It is clear that this fire originated in the cargo in the upper, forward part of number 8 hold, to port of the centerline. On the information presently available, there are only a limited number of mechanisms for ignition, as set out below.

5.1    **Human Agency**

In theory, ignition of the cargo could have been caused by carelessly discarded smoking materials at Cigading. A smoldering ignition source could have ignited cardboard which would then have smoldered until developing into flaming combustion. However, given the time delay between the completion of loading and the outbreak of fire, this appears to be a most unlikely mechanism of ignition.

It would seem that there was no access to the area of origin of the fire in the hold during the course of the voyage and therefore carelessly discarded smoking materials from the crew can likely be discounted.

5.2    **Cargo Lights**

The hold was equipped with electrically operated fixed cargo lights, mounted in the hatch coaming. It was noted that one cargo light fixture was positioned in the forward port corner of number 8 hold. However, there is no evidence to suggest that

this light was switched on and the patterns of burning do not support ignition of the cargo in the vicinity of the light. It appears from the patterns of burning that the fire originated inboard of this light. On balance, therefore, this seems a most unlikely mechanism for ignition.

### 5.3    Frictional Heating

It is understood that the fire was at first observed whilst the vessel was encountering heavy weather and there had apparently been some cargo movement. The possibility of ignition due to frictional heating from moving cargo must therefore be considered. The rubbing of the pallets against the plywood ceiling would in theory produce heat, but given the very limited amount of movement that would be possible and the likely heat losses, ignition of timber by this mechanism seems unlikely. It is perhaps possible that frictional movement permitted quantities of fine wood dust to develop, which would have a lower ignition energy and could conceivable be ignited by frictional heating and by sparks generated by steel bands or nails impacting on each other. However, the probability of ignition by this mechanism appears to be low and I know of no previous fires in this type of cargo being ignited by such a mechanism.

### 5.4    Hot Work

It is known that the crew of the vessel were carrying out maintenance work on the deck around number 8 hatch. Sparks generated by welding or cutting or

grinding are capable of causing ignition of packaging materials such as cardboard and conducted heat can also cause ignition of solid combustible materials. However, I observed no physical evidence indicating that hot work was being carried out in the area in which the fire originated immediately prior to the fire. Furthermore, the crew have indicated that there was no hot work being carried out in the area in which the fire occurred during the period leading up to the fire. If this is correct, then it would appear that hot work can be eliminated as a cause of this fire.

### 5.5    Self-Heating of Rubber Cargo

Consideration has been given to the possibility of self heating of the baled rubber cargo. This seems an unlikely mechanism and there is no known history of this material undergoing self heating without contamination by a strong oxidizer or catalyst.

To summarize, the evidence presently available does not permit the determination of the mechanism of ignition and the cause presently remains unknown.

## 6.     FIRE FIGHTING

It is understood that the smoke detection system functioned correctly at the time of the fire.   The crew acted correctly in shutting down the ventilation system and injecting $CO_2$ into the hold.

The instructions call for the immediate injection of 20 cylinders of $CO_2$, followed by an additional cylinder every 30 minutes until a total of 58 cylinders have been released.   The Master did not follow these instructions.   He elected to discharge 13 cylinders between 1425 hours and 1500 hours.   This reduced quantity of $CO_2$ appears to have extinguished the fire, probably due to the fact that the hold was largely filled with cargo and a $CO_2$ injection point was adjacent to the seat of the fire.

To summarize, although the $CO_2$ system instructions were not followed, the action of the crew proved effective in extinguishing the fire.

12

# 7. CONCLUSIONS

**7.1**    The fire originated in the upper part of the cargo in the forward part of number 8 hold, to port of the centerline.

**7.2**    On the basis of the evidence presently available, the mechanism of ignition must be recorded as unknown.

**7.3**    The crew successfully extinguished the fire using the vessel's fixed $CO_2$ system.



**APPENDIX 1**

## M/V STAR GRAN - A/1468/JGA
### Documents held in Burgoyne files

10/07/2002

Page 1

| Date Rec'd | Name | Doc Date | Description |
|---|---|---|---|
| | Correspondence section of Burgoyne file | | Correspondence section of Burgoyne file |
| | List of documents held in Burgoyne file | | List of documents held in Burgoyne file |
| | JGA's working notes | | JGA's working notes |
| | London office documents | | London office documents |
| | Interoffice messages and emails | | Interoffice messages and emails |
| | Survey report issued by surveyors from South Africa | | Survey report issued by surveyors from South Africa |
| | Log book | | Log book |
| | Documents relating to South Africa | | Documents relating to South Africa |
| | Material composition for S/R grade rubber | | Material composition for S/R grade rubber |
| 0 | Incident report | 22/11/1999 | Incident report |
| 1 | First Notification Checklist to the Company | 07/01/1997 | First Notification Checklist to the Company |

# M/V STAR GRAN - A/1468/JGA
## Documents held in Burgoyne files

10/07/2002
Page 2

| Date Rec'd | Name | Doc Date | Description |
|---|---|---|---|
| | Statement of Benedicto E. Pasinag, Third Officer | | Statement of Benedicto E. Pasinag, Third Officer |
| | Statement of Felix T. Omega, Chief Officer | | Statement of Felix T. Omega, Chief Officer |
| | Statement of Eduardo A. Mesias, Deck Fitter/Able Seaman | | Statement of Eduardo A. Mesias, Deck Fitter/Able Seaman |
| | Statement of Amel P. Dela Cruz, Master | | Statement of Amel P. Dela Cruz, Master |
| | Statement of Ronick R. Santome, Second Officer | | Statement of Ronick R. Santome, Second Officer |
| | Statement of Geroncio B. Lopez, Ordinary Seaman | | Statement of Geroncio B. Lopez, Ordinary Seaman |
| | Deposition of Dante B. Turingan | 04/02/2000 | Deposition of Dante B. Turingan |
| | Deposition of Neil Lazaro E. Busarang | 03/02/2000 | Deposition of Neil Lazaro E. Busarang |
| 0 | Deposition of Geroncio B. Lopez | 03/03/2000 | Deposition of Geroncio B. Lopez |
| .1 | Deposition of Ronick R. Santome | 03/03/2000 | Deposition of Ronick R. Santome |
| 2 | Deposition of Amel P. Dela Cruz | 30/08/2000 | Deposition of Amel P. Dela Cruz |

## M/V STAR GRAN - A/1468/JGA
## Documents held in Burgoyne files

10/07/2002

Page 3

| Date Rec'd | Name | Doc Date | Description |
|---|---|---|---|
| | Deposition of Edwardo A. Mesias | 04/04/2000 | Deposition of Edwardo A. Mesias |
| | Deposition of Justito Paz Balicanta | 03/04/2000 | Deposition of Justito Paz Balicanta |
| | Responses to Interrogatories by Plaintiff Alcan Rubber and Chemical | 30/11/2001 | Responses to Interrogatories by Plaintiff Alcan Rubber and Chemical |
| | Damage Survey report from Matthews, Matson and Kelley, Ltd. | | Damage Survey report from Matthews, Matson and Kelley, Ltd. |
| | Responses to request for production of documents by Plaintiff, Alcan Rubber & Chemical | 30/11/2001 | Responses to Request for Production of Documents by Plaintiff, Alcan Rubber & Chemical |
| | Binder containing photographs taken by JGA, taken by crew and miscellaneous photographs of unknown origin | | Binder containing photographs taken by JGA, taken by crew and miscellaneous photographs of unknown origin |
| | 6 computer disks marked Neil Turner, Report and Photographs and numbered 1 through 6 | | 6 computer disks marked Neil Turner, Report and Photographs and numbered 1 through 6 |
| 3 | Survey Report No. 000101PC by Coppers & Company | 22/01/2000 | Survey Report No. 000101PC by Coppers & Company |
| 1 | Survey Report No. 000101NOLA by Coppers & Company | 22/01/2000 | Survey Report No. 000101NOLA by Coppers & Company |
| 12 | Copies of photographs on 8 1/2" x 11" paper | | Copies of photographs on 8 1/2" x 11" paper |

M/V STAR GRAN - A/1468/JGA
Documents held in Burgoyne files

10/07/2002

Page 4

| Date Rec'd | Name | Doc Date | Description |
|---|---|---|---|
| | Star Shipping brochure | | Star Shipping brochure |
| | STAR GRAN Fire Alarm chart | | STAR GRAN Fire Alarm chart |
| | Pilot chart | | Pilot chart |
| 22/03/2002 | Royal & Sun Alliance Insurance Australia Limited Responses to Interrogatories | 18/03/2002 | Royal & Sun Alliance Insurance Australia Limited Responses to Interrogatories |
| 18/07/2002 | Photographs selected by Frans Coppers and provided by cargo counsel | | Photographs selected by Frans Coppers and provided by cargo counsel |

**APPENDIX 2**

Figure 1



**Figure 2**

